**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **PATRICIA SERWAH** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. WGC-08-3265** |
| **J. C. PENNEY COMPANY, INC.** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Patricia Serwah ("Ms. Serwah") brought this action against Defendant J. C. Penney Company, Inc. ("J. C. Penney") alleging negligence and seeking compensatory damages in the amount of one million dollars ($1,000,000.). The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment. *See* Document No. 10. Pending before the Court and ready for resolution is Defendant's Motion for Summary Judgment (Document No. 15). Plaintiff has filed an Opposition (Document No. 16) and Defendant a Reply (Document No. 17). No hearing is deemed necessary, *see* Local Rule 105.6 (D. Md. 2008), and therefore Defendant's Request for Oral Hearing (Document No. 15) is **DENIED**.

**BACKGROUND**[1]

On Friday, July 13, 2007 between 11:00 a.m. and 12:00 p.m. Ms. Serwah visited the J. C. Penney store at Wheaton Plaza Mall in Montgomery County, Maryland. Her two sons, ages 11 and 14, accompanied her. A self-described "shoe shopaholic," Ms. Serwah arrived at the J. C. Penney store in response to an advertisement about a shoe sale.

Upon arriving at the shoe department, Ms. Serwah's sons wandered to another part of the store. Meanwhile Ms. Serwah began trying on shoes. Ms. Serwah tried on approximately five pairs of shoes, each time looking into a nearby mirror to see how the shoes looked on her feet.

By the time the sales associate brought Ms. Serwah the sixth pair of shoes (white with a heel of three to four inches), other patrons had arrived and congregated in the area. "But when the lady brought the last one, there were some other ladies and their grandchildren and all that around there. So there are little children's shoes and all that right there, so that's why I went to the other mirror." Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem."), Ex. 1 (Serwah Dep. 22:21 - 23:3). Ms. Serwah shops frequently at this particular J. C. Penney store and thus is very familiar with the layout. "I think there are three mirrors. I can tell you everything about J. C. Penney because I go there all the time." *Id.*, Ex. 1 (Serwah Dep. 23:15 - 17). Unable to view

---

[1] In determining whether the moving party has shown there are no genuine issues of any material fact, this Court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Tinsely v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).

When opposing a motion for summary judgment, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ P. 56(e)(2) (2008). A party opposing a motion for summary judgment may also submit discovery and disclosure materials on file. Fed. R. Civ. P. 56(c) (2008). In support of her Opposition Ms. Serwah filed a "Recorded Claims Statement." *See* Pl.'s Mem. P. & A., Ex. B. This recorded statement, taken on September 26, 2007, predates the filing of the Complaint. More importantly Ms. Serwah's recorded statement was not taken under oath. Since this recorded statement does not comply with Federal Rule of Civil Procedure 56(e)(2), the Court will not consider it.

how the shoes looked from the mirror closest to her, as she had done on the previous five occasions, Ms. Serwah rose from her chair and walked toward another mirror. This other mirror was located eight to ten feet away, near the end of the middle aisle.

When Ms. Serwah stood up she observed both people (mothers, grandmothers and children) and shoes on the sales floor. Ms. Serwah began walking toward the mirror navigating around both people and shoes. Approximately halfway to the mirror Ms. Serwah stepped on shoes and began to fall. She attempted to brace her fall by grabbing onto a shoe rack. Unbeknownst to her the shoe rack was not stationary but on wheels. Instead of steadying herself the shoe rack accelerated Ms. Serwah's fall. To avoid striking others or hitting her head on the shoe rack, Ms. Serwah released her grip. She fell to the floor.

**JURISDICTION AND VENUE**

Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Ms. Serwah resides in Montgomery County, Maryland. Compl. ¶ 2. J. C. Penney is incorporated in the state of Delaware and its principal place of business is Plano, Texas. Document No. 1 ¶ 6. The amount in controversy exceeds $75,000, exclusive of interest and costs. *See id.* ¶¶ 4, 7; Compl. at 2. Pursuant to 28 U.S.C. § 1391 venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district. The Court notes J. C. Penney removed this case from state court to federal court. *See* Document No. 1.

**STANDARD OF REVIEW**

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. On the other hand, on those issues on which the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256. However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

**DISCUSSION**

*A. Overview - Premises Liability*

Before addressing the parties' positions regarding any genuine issues of material fact, the Court must address some preliminary matters. Since this Court's jurisdiction is based on diversity of citizenship, the principles outlined in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) require the application of Maryland law to substantive law questions. Under Maryland law a property owner owes a certain duty to an individual who comes in contact with the property, and the scope of the duty owed is dependent upon the individual's status while on the property. *Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 688, 705 A.2d 1144, 1148 (1998). Maryland law recognizes four categories of individuals: (1) an invitee, (2) a licensee by invitation, (3) a bare licensee, and (4) a trespasser. An invitee is an individual who is on the property for a purpose related to the landowner's business. "An occupier of land has a duty to use reasonable and ordinary care to keep the premises safe for an invitee and to protect him from injury caused by an unreasonable risk that the invitee, by exercising ordinary care for his own safety, will not discover." *Henley v. Prince George's County*, 305 Md. 320, 339, 503 A.2d 1333, 1343 (1986). A licensee by invitation is a social guest and the landowner "'owes a duty to exercise reasonable care to warn the guest of dangerous conditions that are known to the [landowner] but not easily discoverable.'" *Flippo*, 348 Md. at 689, 705 A.2d at 1148 (citation omitted). For a bare licensee, a person on the property with permission but for his/her own purposes, a landowner only owes a duty to refrain from willfully and wantonly injuring the bare licensee and to refrain from creating "'new and undisclosed sources of danger without warning

the [bare] licensee.'" *Id.* (citation omitted). For a trespasser, someone who intentionally and without permission enters another's property, a landowner owes no duty except refraining from willfully or wantonly injuring or entrapping the trespasser.

On July 13, 2007 Ms. Serwah was a customer at the J. C. Penney store in Wheaton Plaza. She visited the store in response to an advertisement about a shoe sale. Ms. Serwah was at the store for a purpose related to J. C. Penney's business. Ms. Serwah was thus an invitee on July 13, 2007.

*B. Negligence*

Under Maryland law negligence means doing something a person using reasonable care would not do, or not doing something a person using reasonable care would do. *Maryland Civil Pattern Jury Instruction* 19:1. Ordinary or reasonable care means "that caution, attention or skill a reasonable person would use under similar circumstances." *Id.* To establish a *prima facie* case of negligence, Ms. Serwah must prove (1) a duty owed to her by J. C. Penney, (2) a breach of that duty, (3) causation, and (4) damages. *B.N. v. K.K*, 312 Md. 135, 141, 538 A.2d 1175, 1178 (1988).

J. C. Penney owes a duty of ordinary care to keep its premises safe for an invitee such as Ms. Serwah. That duty is defined as follows:

> [A]n owner or occupier of land only has a duty to exercise reasonable care to "protect the invitee from injury caused by an unreasonable risk" that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or could have discovered in the exercise of reasonable care. The duties of a business invitor thus include the obligation to warn invitees of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against foreseeable dangers.

*Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 388, 693 A.2d 370, 374

(1997) (internal citations omitted).

J. C. Penney is not an insurer of Ms. Serwah's safety while Ms. Serwah is on its premises. "[N]o presumption of negligence on the part of the owner arises merely from a showing that an injury was sustained in his store." *Moulden v. Greenbelt Consumer Servs., Inc.*, 239 Md. 229, 232, 210 A.2d 724, 725 (1965).

Ms. Serwah contends J. C. Penney breached its duty by not "keeping the floor and aisles free from tripping hazards." Pl.'s Mem. P. & A. ("Pl.'s Mem.") at 4. Ms. Serwah argues J. C. Penney should have a policy and practice of bringing one or two pairs of shoes at a time for a customer. This would necessitate J. C. Penney employing sufficient staff. "If the store is attacked by a sudden deluge of customers then shoes must be put away and kept off of the floors and customers, particularly, like [Ms. Serwah], must be guided down a safe aisle and passageway to the mirror." *Id.* at 4-5.

Ms. Serwah is unable to recall the length of time the shoes were on the sales floor before she stepped on them and fell.

> Q: The shoes that were on the floor between you and the mirror, how long were they there before you stepped on them?
>
> A: I can't tell because people put some down as they try them on. If they like it, they either keep it there and add some more to it, or they pick it up and go with them. Somehow they're also beside the chairs just as I had mine, and others also leave theirs there. So I can't tell how long some shoes or certain shoe has been into one place. That's not what my mind was. My mind was to get my shoe that is on sale, get it and go. That's all. That's what I went there for, you know. So I didn't check how long it has been there.

Def.'s Mem., Ex. 1 (Serwah Dep. 27:17 - 28:8).

There is no evidence that an employee of J. C. Penney placed the shoes on the sales floor

which Ms. Serwah tripped over and fell. All reasonable inferences from Ms. Serwah's deposition testimony indicate another customer was responsible for scattering shoes on the sales floor. The facts of this case are thus analogous to cases where patron A spills or drops a liquid and, before the owner becomes aware of the hazard, patron B slips and falls. In such cases the Maryland courts have routinely held that the owner had insufficient time to discover and cure the dangerous condition and thus the owner is not liable. *See Moulden*, 239 Md. 229, 210 A.2d 724; *Montgomery Ward & Co., Inc. v. Hairston*, 196 Md. 595, 597, 78 A.2d 190, 191 (1951); *Maans v. Giant of Maryland, L.L.C.*, 161 Md. App. 620, 871 A.2d 627 (2005); *Rehn v. Westfield America*, 153 Md. App. 586, 593, 837 A.2d 981, 984 (2003).

Typically when a business invitee is injured on a proprietor's premises, the business invitee has the burden of showing the proprietor "created the dangerous conditions or had actual or constructive knowledge of its existence." *Moulden*, 239 Md. at 232, 210 A.2d at 726. Ms. Serwah fails to meet this burden. Ms. Serwah has not presented any evidence showing J. C. Penney had actual or constructive knowledge of the danger caused by shoes scattered by another customer before she tripped and fell. Because Ms. Serwah is unable to establish the second element, *i.e.*, breach of duty by J. C. Penney, Ms. Serwah is unable to establish a *prima facie* case of negligence.[2]

---

[2] In her Opposition Ms. Serwah asserts J. C. Penney had insufficient staff manning the sales floor. *See* Pl.'s Mem. P. & A. at 4. This argument raises the "mode-of-operation" rule. If a proprietor could reasonably anticipate a hazard could arise based on the manner in which his business regularly operates, a plaintiff does not have to prove actual or constructive notice of the hazard. Under the facts of this case Ms. Serwah contends J. C. Penney knew or reasonably should have known that abandoned or scattered shoes on the sales floor are a hazard because this situation occurs regularly with this business. Maryland has rejected the "mode-of-operation" rule and instead applies the actual or constructive pre-injury notice of defect standard. *Maans v. Giant of Maryland, L.L.C.*, 161 Md. App. 620, 636-40, 871 A.2d 627, 636-39 (2005). The Maryland Court of Special Appeals explained the reasoning for not adopting the "mode-of-operation" rule.

> Doing away with the requirement that the invitee must prove how long the

*C. Assumption of Risk*

J. C. Penney argues Ms. Serwah was aware that shoes were on the sales floor and, despite that knowledge, Ms. Serwah walked toward a mirror 8 to 10 feet away to observe how the shoes she tried on looked. In her Opposition Ms. Serwah claims J. C. Penney, through its advertising, enticed "shoe shopaholics" like herself to come to the store. Because a shopaholic is in a state of euphoria and focused on making a purchase, "the shopaholic in her euphoric state may not fully appreciate the risk[,]" Pl.'s Mem. at 5, including hazards posed by shoes on the sales floor.

The following colloquy occurred during Ms. Serwah's deposition regarding the facts and circumstances of Ms. Serwah's fall at the J. C. Penney's Wheaton Plaza store.

> Q: Tell me about the date of this accident.
>
> * * *
>
> A: So that day was a very busy day. We had ladies, children, everything everywhere. So that place was so crowded. So I walk from where I was sitting – – I always sit in the chair to try my shoes on. So where I was sitting, they had people in front of me and beside me that they try their shoes on, so I decided to walk to the next mirror to go and see how the shoe looks on my feet. If it don't look good, I'm not buying, so that's what I do. So I went there, and by walking to the mirror, that's when I tripped over the shoes.
>
> * * *
>
> Q: How many pair[s] of shoes did you try on before the accident occurred?

---

> dangerous condition existed pre-injury is the functional equivalent of doing away with the requirement that the plaintiff prove that the defendant's negligence was the proximate cause of the plaintiff's injury. This case illustrates that point. Without "time on the floor" evidence, the store-keeper would be potentially liable even though there is no way of telling whether there was anything Giant could have done that would have avoided the injury.

*Id.* at 640, 871 A.2d at 639.

A: I tried about five.

Q: Five pairs?

A: Yeah.

Q: Did you walk over and check in the mirror for any of the other pairs?

A: No. Because that time I was there by myself, the mirror was free, so I checked it right there. But when the lady brought the last one, there were some other ladies and their grandchildren and all that around there. So there are little children's shoes and all that right there, so that's why I went to the other mirror.

Q: When you went to go check how the last pair of shoes looked, how far did you have to walk to get to the mirror?

A: If this is where I was sitting, I walked maybe – – maybe like here to where – – from my chair one, two, three, like the fourth chair.

Q: Okay. The ceiling tiles before your head are 2 feet by 2 feet – – 2, 4, 6, 8, between 8 and 10 feet away?

A: Yeah, if I'm not mistaken.

Q: Okay.

A: Yeah, yeah. Because I think there are three mirrors. I can tell you everything about J. C. Penney because I go there all the time. It was the third mirror, was right almost to the end of the middle [a]isle.

Q: Do you wear glasses or corrective lenses?

A: No.

Q: When you got up with the last pair of shoes on and you walked over to the mirror – – you said it was 8 to 10 feet away – – how close did you get to the mirror before you fell?

A: Not far . . . .

Q: Halfway to the mirror?

A: Yeah, I can say, yeah.

Q: Approximately 4 to 5 feet?

A: Something like that.

Q: When you stood up, was there anything blocking your view of the floor?

A: As I said, there was [sic] shoes on the floor, and people, too. There are children, I mean, mother, grandmothers, everything everywhere. Everybody looking for somebody to help them, and they didn't have a lot of sales people there at that time. I think it was almost like lunchtime.

Q: Did you see the shoes on the floor before you got up to go over and look in the mirror?

A: Well, I mean, I saw shoes on the floor, but I didn't put it in my mind that as I'm walking over I'm going to fall.

Q: As you were walking over, did you look at the floor?

A: I did look down the floor, yes, I did.

Q: Did you see the shoes then?

A: Yes, I did.

Q: Okay. You saw the shoes on the floor as you were walking to the mirror?

A: Yes, I did, not just one shoe but shoes.

Q: Why didn't you avoid the shoes, then, if you saw them on the floor?

A: Actually – – that's what I was trying to do. That's what I was trying to do, to avoid it, you know, so that – – I mean, I can go through, and there were people, children, and other people also there. So when I – – I tried to avoid it. All I saw is I was going down, so I tried to even hold onto the rack that they pack the shoes on. And I didn't know that it has wheels underneath. This is the first time of me knowing that that thing has wheels underneath. So that thing

pushed me – – I mean, pulled me further. And for me not to fall on anybody, and my head also, not to fall on the metal, I just let the rack go because it was going to hurt me bad.

Q: You got up. Before you stood up with the shoes on, you saw the shoes on the floor, correct?

* * *

A: Yes. I'm sorry.

Q: If you were worried about stepping on the shoes, why didn't you ask somebody to move them?

A: As I said, it was lunchtime, so those that were helping everybody on the floor at that time, most of them were not there. I know a lot of them there, but I don't know their names, because, as I said, I shop there all the time. My children's shoes and everything, that's where I buy them from. And I go to the shoe and purses department all the time, so I know them by faces. I was there when some of them were there. They left, and later on came back. When they came back, I already fell.

Q: You told me you saw the shoes before you got up out of the chair, you got up, you saw the shoes – –

A: Uh-huh.

Q: – – you walked approximately 4 feet, and that's when you stepped on a shoe which caused you to lose your balance, correct?

A: Yes, sir.

Q: As you were walking from the chair towards the mirror – –

A: Uh-huh.

Q: – – knowing that the shoes were on the floor, were you concerned that you may trip and fall?

A: I mean, it wasn't in my mind that Patricia, I'm going to fall, or I want to fall. You know, my main concern was going to look at my shoe. And if it's okay, if it's to my liking, I just take it and – – I mean, bring it back and add it to the other ones I have and pay and

> go.
>
> Q: The shoes that were on the floor between you and the mirror, how long were they there before you stepped on them?
>
> A: I can't tell because people put some down as they try them on. If they like it, they either keep it there and add some more to it, or they pick it up and go with them. Somehow they're also beside the chairs just as I had mine, and others also leave theirs there. So I can't tell how long some shoes or certain shoe has been into one place. That's not what my mind was. My mind was to get my shoe that is on sale, get it and go. That's all. That's what I went there for, you know. So I didn't check how long it has been there.
>
> Q: Okay. The only thing you were concerned about was getting the shoes that were on sale and leaving?
>
> A: Yeah, because before it was – – you know, the price was like 10 or more dollars more at that time. Every new arrival, you know, is always a little bit more money, so – –
>
> Q: Now, these white shoes that you were wearing, the ones you tried on and wanted to look in the mirror, the heels were 3 to 4 inches?
>
> A: I been wearing that all of my life.

Def.'s Mem., Ex. 1 (Serwah Dep. 18:10, 20:8 - 18, 22:12 - 26:3, 26:6 - 28:19).

The deposition testimony establishes that Ms. Serwah saw the shoes on the floor before she stood and began walking toward the mirror. Ms. Serwah recognized the path to the mirror was obstructed as both people and shoes were on the sales floor. Thus Ms. Serwah knew she had to navigate around the obstacles to reach her destination, *i.e.*, the mirror.

"In Maryland, it is well settled that in order to establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *ADM P'ship v. Martin*, 348 Md. 84, 90-91, 702 A.2d 730, 734 (1997). Courts apply an objective standard to determine

whether the plaintiff had knowledge and appreciation of the risk. If the risk was obvious, a plaintiff's assertion that she did not comprehend the risk will not be heard. *Gibson v. Beaver*, 245 Md. 418, 421, 226 A.2d 273, 275 (1967). "[W]hen it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue is for the court." *Schroyer v. McNeal*, 323 Md. 275, 283-84, 592 A.2d 1119, 1123 (1991).

Ms. Serwah's deposition testimony establishes her knowledge of the risk of danger of shoes scattered on the sales floor. When she stood to walk toward the mirror Ms. Serwah saw shoes on the sales floor. Second, Ms. Serwah appreciated the risk of scattered shoes on the sales floor by navigating around those obstacles.

> Q: Why didn't you avoid the shoes, then, if you saw them on the floor?
>
> A: Actually – – that's what I was trying to do. That's what I was trying to do, to avoid it, you know, so that – – I mean, I can go through, and there were people, children, and other people also there. So when I – – I tried to avoid it.

Def.'s Mem., Ex. 1 (Serwah Dep. 25:8 - 14).

Third, despite knowing the risk, Ms. Serwah voluntarily and intentionally confronted the risk of danger.

> Q: If you were worried about stepping on the shoes, why didn't you ask somebody to move them?
>
> A: As I said, it was lunchtime, so those that were helping everybody on the floor at that time most of them were not there.

*Id.*, Ex. 1 (Serwah Dep. 26:7 - 11).

As revealed by her deposition testimony Ms. Serwah, a self-described "shoe shopaholic" was in, as described in her Opposition, a "euphoric state" about the sale at J. C. Penney. Her

focus was to purchase the shoes she desired at the sales price. The risk of danger of navigating around scattered shoes on the sales floor, particularly in three to four inch heels, was secondary or even immaterial to purchasing the shoes she wanted at the discounted price. "My mind was to get my shoe that is on sale, get it and go. That's all. That's what I went there for, you know." *Id.*, Ex. 1 (Serwah Dep. 28:5 - 7). Ms. Serwah intentionally and voluntarily exposed herself to a known danger. *Morgan State Univ. v. Walker*, 397 Md. 509, 521, 919 A.2d 21, 28 (2007). Assumption of the risk is an affirmative defense to a negligence claim. *Gibson*, 245 Md. at 421, 226 A.2d at 275. Ms. Serwah's assumption of risk bars recovery.

*D. Alternatively, Open and Obvious Danger*

J. C. Penney argues, in the alternative, that if the scattered shoes on the sales floor constituted a dangerous condition, it was an open and obvious condition that Ms. Serwah could have avoided by exercising ordinary care for her safety. Ms. Serwah admits seeing the shoes on the sales floor when she rose from the chair. She also concedes that, despite the risk of danger, her mind was focused on purchasing shoes at a discounted price. A property owner owes a duty to an invitee to warn of known hidden dangers, not open or obvious ones. *Yaniger v. Calvert Bldg. & Constr. Co.*, 183 Md. 285, 288, 37 A.2d 263, 264 (1944).

"[T]he invitee has a duty to exercise due care for his or her own safety. This includes the duty to look and see what is around the invitee." *Tennant*, 115 Md. App. at 389, 693 A.2d at 374. When the danger is obvious, as it was to Ms. Serwah, J. C. Penney is not liable for injuries resulting from Ms. Serwah failing to heed the danger. *Yaniger*, 183 Md. at 288, 37 A.2d at 264. "[T]here is a corresponding duty imposed on the invitee to use care in avoiding an obvious danger[.]" *Id.* Because the danger was open and obvious, Ms. Serwah fails to establish a *prima*

*facie* case of negligence.

**CONCLUSION**

For the foregoing reasons the Court finds there are no genuine issues as to any material fact and J. C. Penney is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An Order will be entered separately.

July 23, 2009 /s/

Date

WILLIAM CONNELLY
UNITED STATES MAGISTRATE JUDGE